Ernesto OCHOA; Pedro Bautista–Botello; Federico Guzman–Delgado; Emigdio Gutierrez–Godinez; Enrique Medina; Masedonio Miranda–Corona; Rosalio Valdez; Jose Vargas; Jose

Cano–Varela; Miguel Aguayo–Arvayo; Manuel Cebreros; Remedios Chavez–Zamorano; Rodolfo Suchil–Fonseca; Rosario Tello–Fabian; Modesto Coronado–Ramirez, Plaintiffs–Appellants,

and

Florencio Carrillo–Valle; Jose Herrera–Herrera, Plaintiffs,

v.

J.B. MARTIN AND SONS FARMS, INC., Defendant–Appellee.

No. 00–16290.

United States Court of Appeals, Ninth Circuit.

Submitted Nov. 7, 2001.*

Filed April 26, 2002.

* The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. PO. 34(a)(2)(C).

Karen E. Tamburro, George McKay and Pamela Bridge, Community Legal Services, Programa Campesino, Phoenix, AZ, for the plaintiffs-appellants.

Frank A. Aloi, Rochester, NY, for the defendant-appellee.

Cynthia L. Rice, California Rural Legal Assistance, Inc., San Francisco, CA, for amicus curiae Mauricio Dominguez, urging reversal.

John J. Rademacher, Park Ridge, IL, and Elizabeth Croron Dribusch, Glenmont, NY, for Amici Curiae American Farm Bureau Federation, and New York Farm Bureau, Inc., urging affirmance.

Before NOONAN, HAWKINS, and TASHIMA, Circuit Judges.

## OPINION

TASHIMA, Circuit Judge.

Plaintiffs–Appellants are 15 migrant farm workers who reside in Arizona who sued Defendant Appellee J.B. Martin and Sons Farms, Inc. ("Martin Farms"), for claims arising under the Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. §§ 1801–1872 (1999), and Arizona state law. The district court dismissed the action for lack of personal jurisdiction over Martin Farms. Appellants timely appealed, contending that Martin Farms had sufficient contacts with Arizona to assert personal jurisdiction in Arizona. We have jurisdiction under 28 U.S.C. § 1291, and we reverse.

## I. BACKGROUND

Martin Farms is a grower located in upstate New York. Ramey Farms, Inc. ("Ramey") is a Texas-based labor contractor. In early 1997, representatives from Ramey traveled to New York to meet with Dave Martin. During that meeting, Martin requested Ramey's help in recruiting migrant labor for the Fall 1997 cabbage and squash harvests.

Before the Fall 1997 harvest began, Martin Farms requested recruiting help from Ramey for summer weeding. For this job, Ramey hired a crew of workers from El Paso, Texas. Martin Farms was dissatisfied with the quality of this crew's work, however, and instructed Ramey to hire a different crew for the upcoming fall harvest. Ramey assured Martin Farms that there were plenty of available farmworkers in San Luis, Arizona, and that it would recruit there for the fall harvest.

In July 1997, Ramey and Martin Farms entered into a contract for the Fall 1997 harvesting season. The pertinent contractual provisions are as follows: employees recruited by Ramey were "the sole and exclusive employees Ramey Farms, Inc. [sic]"; Ramey was responsible "for all aspects of payroll"; Ramey was responsible for transporting the workers from Arizona and in New York; "[a]ny employee that works for ... Martin Farms ... thru Ramey ... cannot be hired directly or indirectly" by Martin; housing, equipment and tools were provided by Martin; and the effective dates of the agreement were July 3, 1997, through December 31, 1997. To cover transportation expenses, Martin Farms paid Ramey $25.00 for each worker transported by bus from Arizona to New York. And, while Ramey contractually controlled "all aspects of payroll," Martin Farms set Appellants' wage rate at $6.00 per hour because it did not want them to be paid more than the farm workers at other farms in the area. Ramey charged

Martin Farms a per employee/per hour fee, which included the employee's base hourly wage, payroll taxes, and worker's compensation costs, plus a fifty-cent commission. Martin Farms was responsible for depositing these fees weekly into a New York bank account opened by Ramey, and Ramey was in charge of directly paying and supervising the farm workers.

In September 1997, Terry Ramey arrived in San Luis, Arizona, and hired 42 farm workers, including Appellants, to work as harvesters in Martin Farms' cabbage and squash fields. The workers were not given written contracts. Rather, they were orally promised $6.00 per hour, 10 hours or more of work per day, free housing, and transportation to and from New York. Before leaving Arizona, Terry Ramey contacted Martin Farms. Once Martin Farms informed Ramey that everything was prepared for harvest, Ramey transported the workers to Martin Farms' labor camp in New York.

Appellants allege that while working in New York, Martin Farms provided substandard housing, in violation of the AWPA, and breached its contracts by not paying the workers all wages that were due and by failing to provide some workers with transportation back to Arizona after the work was completed.

The district court dismissed the action for lack of personal jurisdiction without holding an evidentiary hearing. Appellants appeal.

## II. STANDARD OF REVIEW

The trial court's decision to dismiss for lack of personal jurisdiction is reviewed de novo. *Lee v. City of Los Angeles,* 250 F.3d 668, 680 (9th Cir.2001);

*Myers v. Bennett Law Offices,* 238 F.3d 1068, 1071 (9th Cir.2001). With respect to the burden of proof, while Appellants bear the burden of establishing that personal jurisdiction exists, because "the trial court ruled on the issue relying on affidavits and discovery materials without holding an evidentiary hearing, dismissal is appropriate only if the plaintiff[s] ha[ve] not made a prima facie showing of personal jurisdiction." *Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert,* 94 F.3d 586, 588(9th Cir.1996) quoting (*Fields v. Sedgwick Assoc. Risks, Ltd.,* 796 F.2d 299, 301 (9th Cir.1986)); see also *Sher v. Johnson,* 911 F.2d 1357, 1361 (9th Cir.1990). In determining whether Appellants have met this prima facie burden, uncontroverted allegations in their complaint must be taken as true, and "conflicts between the facts contained in the parties' affidavits must be resolved in [their] favor...." *Am. Tel. & Tel. Co.,* 94 F.3d at 588 (citation and internal quotation marks omitted). Additionally, any evidentiary materials submitted on the motion "are construed in the light most favorable to the plaintiff[s] and all doubts are resolved in [their] favor." *Metro. Life Ins. Co. v. Neaves,* 912 F.2d 1062, 1064 n. 1 (9th Cir.1990) (citation and internal quotation marks omitted).

## III. DISCUSSION

We must decide whether migrant farm workers, recruited by a labor contractor in one state to work on a farm in another state, can assert personal jurisdiction in the state of their residence over a nonresident farm employer. Although the question, in this factual setting, is one of first impression in this Circuit, we apply to it settled principles of law.[1]

---

1. Other courts, however, have confronted this issue. Typically, personal jurisdiction over the foreign farm owner has been exercised.

*See Villalobos v. N. Car. Growers Ass'n,* 42 F.Supp.2d 131, 140 (D.P.R.1999) (holding that there was personal jurisdiction in Puerto

**[1]** Arizona law governs the exercise of personal jurisdiction in this case. *Brainerd v. Governors of the Univ. of Alberta*, 873 F.2d 1257, 1258 (9th Cir.1989). Arizona's long-arm rule permits the exercise of personal jurisdiction to the extent allowed by the due process clause of the United States Constitution. Ariz. R. Civ. P. Rule 4(e)(2). Appellants concede that the district court does not have general personal jurisdiction over Martin Farms and that its specific contacts with Arizona provide the only avenue for personal jurisdiction in the District of Arizona. Due process demands that the defendant have "minimum contacts" with the forum "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Minimum contacts with the forum ensure fairness when requiring a defendant to defend litigation in the forum state. *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291–92, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

This court has established a three-factor test for determining when a state may constitutionally exercise specific jurisdiction over a defendant: (1) the nonresident defendant must do some act or consummate some transaction with the forum state or perform some act by which it purposefully avails itself of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of its laws; (2) the claim must arise out of or result from the defendant's forum-related activity; and/or [2] (3) the exer-

Rico over North Carolina defendants because they had submitted a request for migrant workers into the national farmworker clearance system and they "should have known that such orders would likely be used to recruit workers in Puerto Rico, a traditional source of migrant agricultural labor"); *Astorga v. Connleaf, Inc.*, 962 F.Supp. 93 (W.D.Tex. 1996) (finding personal jurisdiction over a foreign defendant after the defendant hired an intermediary labor contractor who recruited migrant workers in Texas); *Hyppolite v. Gorday*, 115 Lab.Cas. ¶ 35,346 (S.D.Fla.1990) (finding that the labor contractor hired by Gorday Farms acted as its agent when recruiting migrant labor and that, as a result, personal jurisdiction over the foreign farm was appropriate); *Neizil v. Williams*, 543 F.Supp. 899 (M.D.Fla.1982) (finding personal jurisdiction over a foreign defendant after the defendant submitted clearance orders into the interstate clearance system and hired a labor contractor who recruited in the forum state); *Garcia v. Vasquez*, 524 F.Supp. 40 (S.D.Tex. 1981) (finding personal jurisdiction over a foreign defendant after the defendant has submitted clearance orders into the interstate clearance system); *Aguero v. Christopher*, 481 F.Supp. 1272 (S.D.Tex.1980) (same); *Rios v. Altamont Farms, Inc.*, 64 N.Y.2d 792, 486 N.Y.S.2d 913, 476 N.E.2d 312 (N.Y.1985) (finding personal jurisdiction over a foreign defendant who had submitted clearance orders to the interstate clearance system aware of the reality that such orders would be forwarded to surplus labor areas such as Puerto Rico); *see also Castillo v. Case Farms of Ohio, Inc.*, 96 F.Supp.2d 578, 584 (W.D.Tex.1999) ("[T]he history of statutory protections for migrant workers in America is a history of Congress's evolving attempts to prevent agricultural owners and operators from shielding themselves from liability for mistreating employees. By hiring ... intermediary 'independent contractors' to recruit and/or oversee workers, agricultural owners have, at times, sought to create a buffer between themselves and their workers."); *but see Chery v. Bowman*, 901 F.2d 1053 (11th Cir.1990) (finding no personal jurisdiction over a foreign defendant when that defendant's only ties to the forum state was submitting clearance orders into the interstate clearance system and knowing that those orders were forwarded to the forum state).

2. Although Ninth Circuit law formerly required a plaintiff to demonstrate each of these three factors to establish specific jurisdiction, *see Data Disc, Inc. v. Sys. Tech. Assoc.*, 557 F.2d 1280, 1287 (9th Cir.1977), this court has, in light of subsequent Supreme Court precedent, adopted a more "flexible approach." *Brand v. Menlove Dodge*, 796 F.2d

cise of jurisdiction must be reasonable. *Brand,* 796 F.2d at 1073. Because Appellants' injury clearly arose out of activities purposefully directed at Arizona, we focus on the first and third prongs of the test.

### A. Purposeful Availment

■ Neither party contests that Ramey directed its recruiting activities toward Arizona. If Ramey was acting as Martin Farms' agent in this regard, Ramey's activities suffice to provide specific jurisdiction over Martin Farms. *See Theo. H. Davies & Co. v. Republic of the Marshall Islands,* 174 F.3d 969, 974 (9th Cir. 1999) ("In determining the sufficiency of a defendant's contacts, it is not only defendant's activities in the forum, but also actions relevant to the transaction by an agent on defendant's behalf, which support personal jurisdiction.") (internal quotation marks omitted).

The district court ruled that Ramey acted as an independent contractor and thus could not be considered Martin Farms' agent. While the district court's analysis on this point is quite brief, it did conclude that "Martin Farms had no control over the actions of Ramey." This conclusion, however, is at odds with the record. While Ramey conducted the recruiting in Arizona without direct interference by Martin Farms, Martin Farms had previously instructed Ramey not to recruit certain individuals from El Paso, Texas, for the Fall 1997 harvest. Ramey complied with these instructions and, instead, turned to San Luis, Arizona, for migrant labor. While this fact establishes that Martin Farms exercised some control over Ramey, the question becomes, whether this control was sufficiently broad to characterize Ramey as Martin's agent. We conclude that it was.

■ Under Arizona law, the categories "independent contractor" and "agent" are not mutually exclusive. An independent contractor who is not an employee of a principal can nevertheless still be that principal's agent. *See Wiggs v. City of Phoenix,* 198 Ariz. 367, 10 P.3d 625, 628 (Ariz.2000) (en banc). Furthermore, eight criteria are used to determine whether an actor is an independent contractor or an employee: (1) the extent of control over the work and the degree of supervision; (2) the distinct nature of the worker's business; (3) the occupation's required specialization; (4) the provider of materials and the place of work; (5) the duration of employment; (6) the method of payment; (7) the relationship of work done to the regular business of the employer; and (8) the belief of the parties. *Santiago v. Phoenix Newspapers, Inc.,* 164 Ariz. 505, 794 P.2d 138, 142 (Ariz.1990).[3] Examining

1070, 1074 (9th Cir.1986). Jurisdiction may be established with a lesser showing of minimum contacts "if considerations of reasonableness dictate." *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.,* 784 F.2d 1392, 1397 (9th Cir.1986); *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). "Under this analysis, there will be cases in which the defendant has not purposefully directed its activities at the forum state, but has created sufficient contacts to allow the state to exercise personal jurisdiction if such exercise is sufficiently reasonable." *Brand,* 796 F.2d at 1074.

3. Our inquiry is whether Ramey acted as Martin Farms' agent, not whether a master-servant relationship existed between the two. Specifically, the question here is not whether Ramey acted as *either* an independent contractor or Martin Farms' employee, but rather whether Ramey acted as *both* an independent contractor *and* an agent of Martin Farms. Thus, *Santiago* does not directly control the analysis here. Its framework, however, is nonetheless instructive. While *Wiggs* established that an independent contractor can also be an agent, it did not illuminate the circumstances under which that can be so. *See* 10 P.3d at 627 (holding merely that an

Ramey's and Martin's relationship through the lens of *Wiggs* and *Santiago* reveals that Ramey was acting as Martin Farms' agent while recruiting in Arizona and managing in New York.

### (1) Martin Farms' Control Over Ramey

■ The "fundamental criterion" for determining whether an actor is a purely independent contractor "is the extent of control the principal exercises or may exercise over the agent." *Id.* at 141. "A strong indication of control is ... [the] power to give specific instructions with the expectation that they will be followed." *Id.* at 142–43.

Martin Farms exercised very little day-to-day control over Ramey's recruitment and management of the Arizona migrant workers. Ramey arranged most of the recruiting logistics and managed the workers once they arrived in New York. Martin Farms, however, possessed the power to give Ramey instructions, and to expect that its instructions would be followed. In fact, Martin Farms did exactly that when it instructed Ramey not to use the El Paso crew for the Fall 1997 harvest, and when it instructed Ramey that the migrant harvesters were not to be paid more than $6.00 per hour. Additionally, Martin Farms dictated the timing of Ramey's recruiting in Arizona and transportation to New York. In fact, every instruction that Martin Farms gave to Ramey was followed. Martin Farms' ability to exercise control over Ramey weighs in favor of establishing that Ramey acted as Martin Farms' agent.

independent contractor is an agent when the "(principal) instructs the independent contractor (agent), on what to do, but not how to do it"). The factors considered in *Santiago* assist our *Wiggs'* inquiry in that they help distinguish purely independent contractors from those who are both an independent contractor and an agent.

### (2) The Distinct Nature of Ramey's Business

■ Whether someone acts to promote his own independent enterprise or to further the business of another will aid the fact finder in ascertaining the existence of a purely independent contractor. *Id.* at 143. "A concomitant inquiry to this factor also considers whether the worker's job performance results in a profit or loss for the worker. Thus, where the worker purchases the product and then sells it at a profit or loss, the worker is more likely to be found an independent contractor." *Id.* This factor weighs in favor of characterizing Ramey as an independent contractor. Ramey is in the business of providing migrant labor to farms; this business clearly preexisted, and is independent of, Ramey's relationship with Martin Farms.[4] Furthermore, Ramey made a commission on every hour worked by every migrant worker. However, while this factor weighs in favor of classifying Ramey as an independent contractor, it does not in any way preclude a finding that Ramey also acted as Martin Farms' agent.

### (3) Ramey's Specialization/Skills

■ A fact finder is more likely to classify someone as an independent contractor when the work involved requires highly specialized or educated skills. *Id.* at 143. This factor weighs in favor of characterizing Ramey as Martin Farms' agent. The process of hiring migrant labor, transporting them from Arizona to

4. The provision in the Ramey/Martin Farms contract that precluded Martin Farms from independently hiring the labor provided by Ramey strengthens this conclusion. This provision would not make any sense unless Ramey envisioned its business as being independent of Martin Farms and in need of protection.

New York, and managing them while in New York, did not require Ramey to be highly educated or skilled. While these tasks undoubtedly present logistical challenges, such logistical "skills are required in differing degrees for virtually any job," *id.*, and thus do not establish that Ramey was a purely independent contractor.

### (4) Materials and Place of Work

Where someone is supplied tools, and works over a specific area or a fixed route, an independent contractor relationship is not indicated. *Id.* at 144. This factor also weighs in favor of classifying Ramey as Martin Farms' agent. Martin provided all the tools and equipment necessary for harvesting the squash and cabbage. Furthermore, it dictated the migrant workers' work area.

### (5) Duration of Ramey's Employment

Whether someone seeks another's services as a one-time, discrete job or as part of a continuous working relationship may indicate that an independent contractor relationship exists, although the duration of employment does not control whether an agency relationship exists. "The shorter in time the relationship, the less likely the worker will subject himself to control over job details." *Id.* While the contract between Martin Farms and Ramey is a one-time agreement, spanning the course of six months, the record indicates that Ramey had provided services to Martin Farms once before (for Summer 1997 weeding), and that Martin Farms issued specific recruitment instructions to Ramey only when it came time for Ramey to recruit for Martin Farms a second time (for the Fall 1997 harvest). In light of the ongoing relationship between Ramey and Martin, this factor, at the very least, weighs in favor of classifying Ramey as an independent contractor acting as Martin's agent.

### (6) Method of Payment

When payment occurs on a per hour basis, an independent contractor relationship is not indicated. *Id.* We conclude that this factor is neutral and does not weigh in favor of either finding. Although Ramey's "commission" was calculated on an hourly basis, it was based on the hours worked by Appellants, and not by Ramey.

### (7) Relationship of Work to the Regular Business of Martin

A court is not likely to classify someone as an independent contractor when the work is part of another's regular business. *Id.* Because Ramey did not limit its "attempt to contract to a particularly 'well-defined incidental activity ... ancillary to the central concerns of [the] business ... but rather [had contractually involved itself in] the ongoing basic employment activity' itself," *id.* at 145 (quoting *Anton v. Indus. Comm'n*, 141 Ariz. 566, 688 P.2d 192, 199 (Ariz.App.1984)), this factor weighs in favor of classifying Ramey as Martin Farms' agent. Harvesting is of central importance to Martin Farms' business; growing crops is of no use if a workforce is not available to harvest the crops in a timely manner.[5]

**5.** In *Santiago,* the court concluded that the home delivery process is central to a newspaper's survival, thus classifying the newspaper's delivery staff as employees, not independent contractors. *See* 794 P.2d at 145. ("The delivery of newspapers within a reasonable time after publication is essential to the success of the newspaper business.... The delivery boys are just as much an integral part of the newspaper industry as are the type-setters and pressmen or the editorial staff."). In much the same way, the harvesters are essential to the success of any farming business; they are just as integral to the farming industry as the farmers and growers themselves.

### (8) Belief of Parties

" 'It is not determinative that the parties believe or disbelieve that the relation of [independent contractor or] master and servant exists, except insofar as such belief indicates an assumption of control by the one and submission of control by the other.' "  *Id.* (quoting RESTATEMENT (SECOND) OF AGENCY § 220 cmt. m (1957)).  There is little direct evidence in the record of the parties' belief or intent; thus this factor is unhelpful in illuminating the status of their relationship.

To summarize, Martin Farms issued instructions to Ramey and expected those instructions to be followed; Martin Farms controlled the work to be done and provided the tools, equipment, and housing; Ramey lacked highly specialized skills; the relationship between Ramey and Martin Farms was ongoing; and Ramey's recruiting and management tasks were not ancillary to the central concerns of Martin Farms' business.  In light of these factors, the *Santiago* analysis instructs that Ramey, as an independent contractor, acted as Martin Farms' agent when recruiting and managing Appellant farm-workers.

### B.  Reasonableness

■■■ Due process also demands that the district court's assertion of jurisdiction over Martin Farms be reasonable.  *Brainerd*, 873 F.2d at 1260.  Because Martin Farms' agent purposefully availed itself in Arizona, the district court's jurisdiction is presumed reasonable unless Martin Farms makes a compelling case to the contrary. *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174("[W]here a defendant who purpose-

fully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."). Martin Farms has failed to make such a compelling case; therefore, we hold that the assertion of jurisdiction over Martin Farms is reasonable.

■■■ Martin Farms is a relatively small, family-owned operation that will bear added cost if this case is litigated in Arizona.  The burden on the defendant, however, should be considered in light of the burden on the plaintiff.  *World–Wide Volkswagen*, 444 U.S. at 292, 100 S.Ct. 559; *Brand*, 796 F.2d at 1075.  Appellants assert that they are financially incapable of litigating the case in New York. While Martin Farms disputes this contention, pointing out that the farmworkers have already filed a complaint in the Western District of New York, Appellants respond that the New York action was filed only as a protective measure to preserve their claims.  Given that Appellants are migrant workers of very limited means,[6] we conclude that Appellants' burden in suing Martin Farms in New York far outweighs Martin Farms' burden in defending this action in Arizona.

■■■ Furthermore, while the court sitting in a district where an injury occurred, and where witnesses are located, ordinarily is the most efficient forum, *Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir.1995), considerations of judicial efficiency do not weigh heavily in this

---

**6.** Only 10% of farmworkers nationwide are provided paid vacation benefits, and more than 60% of farmworkers nationwide have incomes below the poverty level.  NAT'L AGRICULTURAL WORKERS SURVEY 1997–1998, A DEMOGRAPHIC AND EMPLOYMENT PROFILE OF UNITED STATES FARMWORKERS' Research Rep. No. 8,

U.S. Dep't of Labor, Office of the Asst. Sec. for Pol., Office of Program Economics, March 2000, 36, 39. While these statistics only speak to nationwide trends, they bolster Appellants' assertions that socioeconomic considerations prevent them from being able to litigate this case in New York.

case. Appellants' contracts were formed in Arizona, while the Arizona Wage Payment, trover and conversion, negligent supervision, and AWPA violations occurred in New York. The witnesses needed to substantiate these claims are located in both states. While more claims arise out of activities that occurred in New York, many of the witnesses needed to investigate and substantiate these claims are Arizona residents. Appellants also assert that the payroll records, bank account receipts, and videotapes of the New York housing conditions could easily be shipped to Arizona. These assertions seem reasonable and are not directly contested by Martin Farms.

Finally, although New York does have an interest in what New York employers do, the bulk of the claims are based on the AWPA, and Arizona unquestionably has a strong interest in protecting its residents from injury and in furnishing a forum where their injuries may be remedied. *See Gates Learjet Corp. v. Jensen,* 743 F.2d 1325, 1333 (9th Cir.1984); *Data Disc,* 557 F.2d at 1288. The district court found that this consideration weighed in favor of Martin Farms, in light of the location of the farm workers' housing. In so holding, however, the district court failed to consider Arizona's interest in protecting its citizens and residents from being exploited by out-of-state employers. Any harm created by Martin Farms' sub-standard New York housing was exacted upon *Arizona* residents, thus diminishing New York's interest in this case. *Pacific Atlantic Trading Co. v. M/V Main Express,* 758 F.2d 1325, 1330 (9th Cir.1985).

In sum, the purposeful interjection of Martin Farms' agent into Arizona, the relative disparity in burdens between Appellants and Martin Farms, and the strong Arizona interest in protecting its citizens and residents from manipulation by out-of-state employers lead this court to conclude that it is reasonable for the district court to exercise jurisdiction over Martin Farms.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the district court erred in dismissing this action for lack of personal jurisdiction over Martin Farms. The judgment of the district court is therefore,

**REVERSED and REMANDED** for further proceedings.